S. LANE TUCKER
United States Attorney

SETH BRICKEY
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: seth.brickey-smith@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>COREY POTTER, KYLE POTTER, and JUSTIN WELCH,<br><br>Defendant. | No. 3:24-cr-00047-SLG |

## GOVERNMENT'S BRIEF IN SUPPORT OF CONDITIONS OF RELEASE

The government does not intend to seek pretrial detention in this case. However, the government hereby requests the Court impose several special conditions of pretrial release that are necessary to ensure the defendants do not pose a danger to the safety of the community. Specifically, the government requests the Court impose the following conditions for each defendant:

1. The defendant shall not operate, transport, or move the F/V ARCTIC DAWN and/or the F/V GAMBLER outside the state and federal waters of Alaska, which encompass the U.S. Exclusive Economic

Zone surrounding the State of Alaska.

2. The defendant shall keep the automatic identification system, or AIS, active and transmitting while operating the F/V ARCTIC DAWN and/or the F/V GAMBLER.

Balancing the grave ecological risks posed by the defendants' unlawful conduct in this case against their interest in continued commercial fishing, these conditions are the least restrictive combination of conditions to reasonably assure the safety of any other person and the community. *See* 18 U.S.C. § 3142(C)(1)(B).

## BACKGROUND

### *Bitter Crab Syndrome*

"To our knowledge, no other disease of a wild marine species has the potential to significantly impact widespread economies and ecosystems like Bitter Crab Disease does."[1]

Bitter Crab Syndrome (BCS) is a disease fatal to crustaceans that is caused by a parasitic dinoflagellate of the genus *Hematodinium*.[2] To date, nearly thirty species of crustaceans are known to be infected by BCS, including several commercially important species such as the snow crab from the Gulf of Alaska, the Bering and Chukchi Seas, eastern Canada and Greenland; Tanner crab from Southeast Alaska, the Gulf of Alaska,

---

[1] *Bitter Crab Disease: determining the potential of a parasite to impact economies and ecosystems*, University of Prince Edward Island (Sept. 19, 2007), available at https://www.upei.ca/communications/news/2007/09/bitter-crab-disease-determining-potential-parasite-impact-economies-and (quoting Dr. Frank Morado, a leading expert on Bitter Crab Syndrome).

[2] Frank Morado, *BCS: A Major Player in the Global Theater of Marine Crustacean Disease*, Alaska Fisheries Science Center Quarterly Report (Sept. 2007), available at https://apps-afsc.fisheries.noaa.gov/Quarterly/jas2007/jasfeaturelead.htm (last accessed Apr. 17, 2024)

*U.S. v. Potter et al.*
3:24-cr-00047-SLG     Page 2 of 8
Case 3:24-cr-00047-SLG   Document 11   Filed 04/22/24   Page 2 of 8

and Bering Sea; and the grooved Tanner crab from western Vancouver Island.[3] BCS's natural route of transmission has not been conclusively established.[4] Although there is no danger to humans from consuming crab infected with BCS, an early study on BCS reported that the disease caused 100% mortality in naturally infected crab maintained in flowing seawater during a five month period.[5] Once infected with BCS, crab take on cooked color, an unpleasant taste, and are unmarketable.[6]

The Alaska Department of Fish and Game considers BCS the "principle threat to Tanner crab stocks in Alaska."[7] Accordingly, the State of Alaska has implemented special control measures for Tanner crab in designated areas of high infection rates "to minimize the spread, and to reduce the incidence, of bitter crab syndrome." 5 AAC 35.120(a). Specifically, in areas of significant BCS infection,

> a person shall contact a local representative of the department before fishing for Tanner crab in an area of significant infection by BCS and shall contact a local representative of the department before leaving the area; all fishing vessels shall deliver all Tanner crab harvested in an area of significant infection by BCS to a tender or processor, and may not discard the crab overboard . . .

5 AAC 35.120(a)(1).

---

[3] *Id.*

[4] Hematodinium *sp. – Bitter Crab Disease of Tanner Crabs*, available at https://www.adfg.alaska.gov/static/species/disease/pdfs/crustaceandiseases/hematodinium_sp.pdf (last visited Apr. 17, 2024)

[5] Theodore R. Meyers, et al., *Bitter Crab Disease: A Fatal Dinoflagellae Infecton and Marketing Problem for Alaskan Tanner Crabs Chionoectes Bairdi*, 3 Diseases of Aquatic Organisms 195 (Dec. 1987)

[6] Morado, *BCS: A Major Player in the Global Theater of Marine Crustacean Disease* at 1.

[7] Alaska Dep't of Fish and Game, *Tanner Crab (*Chionoecetes biardi *and* C. opilio*)*, available at https://www.adfg.alaska.gov/index.cfm?adfg=tannercrab.printerfriendly (last visited Apr. 17, 2024)

*U.S. v. Potter et al.*
3:24-cr-00047-SLG                Page 3 of 8
Case 3:24-cr-00047-SLG   Document 11   Filed 04/22/24   Page 3 of 8

Even when ADF&G has not specifically designated an area as one of significant BCS infection, Alaska Statute (AS) 16.10.240 (a), provides "A person may not take out of or ship, transport, or send from [Alaska] any commercially taken live crab, unless the crab have been landed in a port in the state and recorded on a fish ticket form prescribed by the [Alaska Department of Fish and Game]." 5 Alaska Administrative Code (AAC) 39.130(c) similarly requires fish tickets be completed and submitted for fish harvested in the waters of Alaska.

*Defendants Unlawfully Transport Commercially Harvested Crab*

In February and March 2024, two crab catcher vessels owned and operated by Corey Potter, the F/V ARCTIC DAWN and the F/V GAMBLER, commercially harvested Tanner and golden king crab in waters of Southeast Alaska. F/V ARCTIC DAWN was captained by Kyle Potter, Corey Potter's son. Justin Welch, who Corey Potter hired, captained the F/V GAMBLER. Corey Potter directed Kyle Potter and Justin Welch to take their harvest of live crab to Seattle, Washington, where they intended to sell it for a higher price than they would have received in Alaska. At the time, F/V ARCTIC DAWN had 1,625 individual tanner crab aboard, weighing approximately 4,280 pounds aboard. F/V GAMBLER had 374 individual golden king crab aboard, weighing 2,922 pounds.

Before leaving Alaska, neither F/V ARCTIC DAWN nor the F/V GAMBLER landed their harvested crab at a port in Alaska. Nor did Corey Potter, Kyle Potter, or Justin Welch record the harvest on a fish ticket. Thus, over 7,000 pounds of crab was taken from the Alaskan crab fishery and not reported. F/V ARCTIC DAWN and F/V GAMBLER proceeded through Canadian waters and into Washington waters on their journey to Seattle.

*U.S. v. Potter et al.*
3:24-cr-00047-SLG        Page 4 of 8
Case 3:24-cr-00047-SLG   Document 11   Filed 04/22/24   Page 4 of 8

Following the multi-day voyage from the fishing grounds, a large portion of the king crab aboard the F/V GAMBLER (approximately 42% or 1,251 pounds) was deceased and unmarketable. Corey Potter acknowledged that the F/V ARCTIC DAWN was carrying some crab that was infected by BCS. Accordingly, the catch was transferred to Washington Department of Fish and Wildlife (WDF&W) to be disposed of in a landfill due to the potential for BCS infected Tanner crab at the direction of WDF&W biologists.

Law enforcement executed a search warrant on Corey Potter, Kyle Potter, Justin Welch, and the vessels when they returned to Alaska. Because the targets of the warrant were not all in the same place, the warrant was not executed simultaneously. Justin Welch was the first defendant to be searched, and his cellphone was seized by law enforcement. Justin Welch then contacted Corey and Kyle Potter, informing them that law enforcement had interviewed him and seized his cellphone. By the time law enforcement was able to execute the warrant on Kyle Potter, he told law enforcement that he and Corey Potter had deleted communications related to their crab harvest after learning the Justin Welch's cellphone had been seized by law enforcement.

## DISCUSSION

The Bail Reform Act governs the detention or release of a defendant pending trial. 18 U.S.C. § 3142. One purpose of the 1984 law is to address "the alarming problem of crimes committed by persons on release," by ensuring that courts are given "adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released." S.Rep. No. 225, 98th Cong., 1st Sess., at 3 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3185. Accordingly, the statute requires

*U.S. v. Potter et al.*
3:24-cr-00047-SLG Page 5 of 8
Case 3:24-cr-00047-SLG   Document 11   Filed 04/22/24   Page 5 of 8

judicial officers to impose the least restrictive release conditions that will "reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The statute provides that every person charged with an offense who is released by a judicial officer is subject to the "condition that the person not commit a Federal, State, or local crime during the period of release." 18 U.S.C. § 3142(b) and (c). In addition, district courts are empowered to impose any further condition, or combination of conditions, that it determines will reasonably assure the safety of any other person and the community. 18 U.S.C. § 3142(c)(1)(B).

The defendants' conduct in this case demonstrates a flagrant disregard for laws regulating the commercial harvest of crab in Alaska. They unlawfully removed crab worth tens of thousands of dollars, without landing the crab and reporting the harvest on a fish ticket. Had the defendants not been caught by law enforcement, over three tons of crab would have vanished from the fishery without a trace. Further, their unlawful transportation of crab to Washington resulted in immense waste: 1,251 pounds of king crab dead on arrival and 4,280 pounds of Tanner crab destroyed on arrival to prevent infection. This type of conduct has a direct impact on the future viability of the crab fishery in Alaska and steals crab from the pots of law-abiding fishermen.

Beyond threatening the effective management and viability of the Alaskan crab fishery through undocumented harvests, the defendants' actions also posed a grave ecological risk due to the BCS infected crab aboard the F/V ARCTIC DAWN. Alaska laws requiring that live crab be landed at a processor before being taken out of state do more than ensuring harvests are reported, these laws also give Alaskan processors the

*U.S. v. Potter et al.*
3:24-cr-00047-SLG    Page 6 of 8
Case 3:24-cr-00047-SLG    Document 11    Filed 04/22/24    Page 6 of 8

opportunity to sort crab, detect infected crab, salvage uninfected crab, and dispose of infected crab properly before it is allowed to leave Alaska. This protects the reputation of the Tanner crab fishery by keeping poor-quality crab off the market and preventing infection from spreading. The defendants circumvented these important measures. Instead, transporting unreported, potentially infected Tanner crab over 800 miles, between two states, across two international boundaries, and through countless ecosystems. The defendants' actions posed a risk not only to the Alaskan community, but to Canada and Washington as well. Indeed, WDF&W biologists determined the ecological risk was so significant that the entire Tanner crab harvest aboard the F/V ARCTIC DAWN had to be destroyed.

Based on the ecological risks posed by the defendants' continued commercial fishing activities, the conditions requested by the government would contain their fishing activities to the waters surrounding Alaska—mitigating their interstate and international risk—and would allow regulators and law enforcement the ability to readily determine the locations of the vessels and detect violations. Moreover, because two of the defendants have already demonstrated a willingness to destroy evidence and obstruct justice, monitoring the locations of the two vessels at issue in this case—*i.e.*, F/V ARCTIC DAWN and F/V GAMBLER—will mitigate the risk that the defendants would secrete or destroy them as evidence and forfeitable property. Neither of the proposed conditions will prevent the defendants from lawfully engaging in Alaskan commercial fisheries during the pendency of this case.

//

*U.S. v. Potter et al.*
3:24-cr-00047-SLG           Page 7 of 8
Case 3:24-cr-00047-SLG   Document 11   Filed 04/22/24   Page 7 of 8

## CONCLUSION

The government submits that the two proposed conditions of pretrial release, in addition to the standard conditions will reasonably assure the safety of the community. 18 U.S.C. § 3142(c).

RESPECTFULLY SUBMITTED April 22, 2024 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

s/ *Seth Brickey*
SETH BRICKEY
Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2024 a true and correct copy of the foregoing was served electronically on all counsel of record.

s/ *Seth Brickey*

*U.S. v. Potter et al.*
3:24-cr-00047-SLG         Page 8 of 8
Case 3:24-cr-00047-SLG   Document 11   Filed 04/22/24   Page 8 of 8